# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DISTRICT

TCFIF INVENTORY FINANCE, INC., )
)
             Plaintiff, )           Case No: 12 C 332
)
             v. )           Judge Joan H. Lefkow
)
APPLIANCE DISTRIBUTORS, INC. )
d/b/a ADI, et al., )
)
             Defendants. )

## OPINION AND ORDER

Plaintiff TCF Inventory Finance, Inc. ("TCFIF"), filed an eight-count complaint (dkt. 1) in connection with a loan it made to Appliance Distributors Inc., d/b/a/ ADI ("ADI"), and which various entities and individuals guaranteed. After ADI defaulted on its obligations, TCFIF sought relief from the former owners of ADI, defendants Fredella Prather and Donnie Prather, Jr. (together, "the Prathers"), whom TCFIF asserts guaranteed the loan. TCFIF originally brought this suit not just against the Prathers but also against ADI and the other guarantors of the loan: Prather Services, Inc.; Wade and Rebecca Kundinger (together, "the Kundingers"); Kundinger Holding Company, Inc.; and Sundrop Holding Group, Inc. (*See* dkt. 1.) TCFIF voluntarily dismissed suit against the Kundingers (dkt. 14), and the court entered default judgment against all other defendants save the Prathers (dkt. 30). Pending before the court is TCFIF's motion for summary judgment against the Prathers (dkt. 52), the Prathers' cross-motion for summary judgment in their favor (dkt. 60), and the Prathers' motion to strike certain facts asserted by

TCFIF (dkt. 74).  TCFIF's motion for summary judgment is granted, the Prathers' cross-motion is denied, and their motion to strike is granted in part and denied in part.[1]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56(c).  In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction.  *See, e.g.*, *Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).  The court may not weigh conflicting evidence or make credibility determinations.  *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

If a claim or defense is factually unsupported, it should be disposed of on summary judgment.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact.  *Id*. at 323.  In response, the non-moving party cannot rest on bare

---

[1]  The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.  Venue is appropriate in this district because the parties consented to the jurisdiction of courts in Illinois and because TCFIF's principal place of business is located in this district.

pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND[2]

The Prathers are the former owners of ADI, an appliance distribution business they operated for a number of years before selling it to the Kundingers in August 2010. While the Prathers ran ADI, it was financed through a line of credit that the Prathers opened in 2009 with TCFIF pursuant to an inventory security agreement ("the security agreement"). Under the security agreement, TCFIF agreed to provide "floor plan financing," under which it would finance ADI's acquisition of inventory in its ordinary course of business. In exchange, ADI agreed to make payments to TCFIF as required by the terms of the security agreement.

The Prathers decided to sell ADI in 2010 and identified the Kundingers as potential purchasers. The two couples set a closing date of August 5, 2010. Prior to closing, the Prathers contacted TCFIF about continuing to provide financing to ADI following the sale. After performing a credit review of ADI using projected financials under the Kundingers' ownership, TCFIF notified the Prathers and Kundingers on July 21, 2010 that TCFIF would continue its line of credit to ADI after the sale subject to a litany of requirements. (Dkt. 71, Ex. 1.A.) One of these requirements was that the Prathers execute a personal guaranty of the financing agreement "[w]ithin 3 [w]eeks of [c]losing." (*Id.*)

TCFIF and the Prathers began to negotiate the terms of this guaranty, and, in particular, its duration. At the outset, TCFIF requested that the Prathers guarantee liabilities under the

---

[2] The facts in the background section are taken from the parties' Local Rule 56.1 statements of facts. The court will address many but not all of the factual allegations in the parties' submissions, as it is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare*, 629 F.3d at 704. The court will discuss the Prathers' motion to strike as necessary and will limit its analysis to evidence "properly identified and supported in the parties' statements." *Bordelon* v. *Chicago School Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

security agreement for two years post-sale. The Prathers objected. Fredella Prather sent an email on July 13, 2010, to Mary Alice Warren, a senior corporate credit manager at TCFIF, stating that six months was the most she "would be interested in signing a personal guaranty" because that was the amount of time she and Donnie "will physically be here" at ADI after the sale to assist with the transition. (Dkt. 67, Ex. 4 at 2.) Warren suggested 18 months, which she explained was "based on your six months of hands-on training [at ADI] plus twelve months of phone training" that the Prathers had agreed to provide to the Kundingers.[3] (*Id.*) Warren further informed Fredella Prather that TCFIF was "firm on the 18 months" but it could call a special credit committee meeting to discuss the issue. (*Id.* at 1.) Warren and Fredella Prather continued their email exchange in July, with Fredella Prather stating that the Prathers' attorney preferred the personal guaranty be limited to 12 months and Warren responding that TCFIF had already "compromised on 18 months" as opposed to 24 months. (Dkt. 61, Ex. 6 at 1.) TCFIF sent the Prathers and Kundingers an updated letter with the requirements for continued financing on August 3, 2010, reflecting which conditions had already been fulfilled. (*See* dkt. 67, Ex. 3.) The letter reiterated that within three weeks of closing, the Prathers would need to execute the personal guaranty "limited to $500,000 and 18 months (limitations are post closing)." (*Id.*)

On the date of closing, August 5, 2010, Warren forwarded Fredella Prather and the Kundingers an email she had previously sent Fredella Prather on July 16, 2010 with the documents that the Kundingers would need to sign at closing. These documents included an addendum to the security agreement, a corporate incumbency certificate for ADI, and a corporate

---

[3] TCFIF denies that its proposal of 18 months "was in any way dependent upon the time the Prathers planned to assist the Kundingers with ADI." (Dkt. 71 ¶ 10.) This statement is belied by Warren's email, quoted above, and Warren's affidavit, in which she states, "While the 18 month term of the Guaranty corresponded to the time that the Prathers and Kundingers had negotiated for the Prathers to assist with ADI, TCFIF had no control over or involvement in this separate agreement between the Kundingers and Prathers." (Dkt 63, Ex. 1, Mary Alice Warren Affidavit ("Warren aff.") ¶ 9.)

incumbency certificate for Prather (but not the guaranty). In the body of the August 5, 2010 email, Warren wrote, "Our Legal Department has not yet reviewed and approved the Personal Guaranty and Debt Sub Agreements which had to be customized for this transaction. I hope to have those documents within the next week." (Dkt. 61, Ex. 8 at 1.)

The Prathers *did* execute a personal guaranty at the closing, however ("the guaranty"), entered into "[f]or value received and in consideration of any loan or other financial accommodation of any kind heretofore, nor or hereafter made or given by [TCFIF] to [ADI]." [4] (*See* dkt. 54, Ex. 1.B ("guaranty") at 1.) It limited the Prathers' liability to "an amount equal to

---

[4] The crux of this suit is whether this guaranty is valid. The Prathers insist that the guaranty they signed is a "prior and inaccurate draft of the guaranty they had negotiated." (Dkt. 65 ¶ 8.) They also move to strike paragraphs 29 and 30 of TCFIF's statement of additional facts (dkt. 63 ¶¶ 29, 30) and their supporting paragraphs in Warren's affidavit (Warren aff. ¶¶ 13, 14). Paragraph 13 of Warren's affidavit states, "Although TCFIF allowed extra time, the negotiated Guaranty was ultimately ready in time for the closing between the Kundingers and Prathers, and the Guaranty was provided by TCFIF for the closing." (*Id.* ¶ 13.) Paragraph 29 of TCFIF's additional statement of facts says almost exactly the same thing. (Dkt. 63 ¶ 29.) Paragraph 14 of Warren's affidavit states, "The Prathers executed the negotiated Guaranty at the closing on August 5, 2010." (Warren aff. ¶ 14.) Paragraph 30 of TCFIF's statement of additional facts says the same thing.

The Prathers argue that these paragraphs must be stricken because Warren does not assert her personal knowledge of the negotiated guaranty being delivered in time for closing and does not identify "who sent [the guaranty] to whom, when the negotiated guaranty was sent, or that she personally observed that it was sent." (Dkt. 74 ¶ 8.) TCFIF does not respond.

Rule 56(e) of the Federal Rules of Civil Procedure "requires that affidavits offered in opposition to summary judgment be made on personal knowledge, . . . setting forth such facts as would be admissible in evidence, and . . . showing affirmatively that the affiant is competent to testify to the matters stated therein." *Drake* v. *Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998) (quotations and brackets omitted). "'Personal knowledge' includes inferences—all knowledge is inferential—and therefore opinions. But the inferences and opinions must be grounded in observation or other first-hand experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Vissier* v. *Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 659 (7th Cir. 1991) (citations omitted); *see also Toro Co.* v. *Krouse, Kern & Co.,* 827 F.2d 155, 162-63 (7th Cir. 1987) ("Statements based merely on information and belief do not satisfy the standards of Rule 56(e).").

The court will not strike these paragraphs. The first paragraph of Warren's affidavit explains that the facts set out therein are based on her personal knowledge and on TCFIF's business records. (Warren aff. ¶ 1.) Additional support for how Warren knew the Prathers executed the guaranty on August 5, 2010 comes further down in her affidavit where she explains that she received an executed version of the guaranty from the attorney who oversaw the closing and attaches a copy of the letter from that attorney. (Warren aff. ¶ 16; *id.*, Ex. 1.B.) Paragraphs 13 and 14 of her affidavit are thus properly supported and TCFIF can rely on them in paragraphs 29 and 30 of its statement of additional facts..

$500,000.00" and provided that the Prathers' liability "shall not extend to any Liabilities created after February 5, 2012," *i.e.*, 18 months past closing. (*Id.*) The last paragraph provides it would "continue in effect for a period of ten (10) years" starting August 5, 2010. (*Id.* at 3.) Wade Kundinger also executed an addendum to the security agreement on August 5, 2010, as the new owner of ADI. (Dkt. 54, Ex. 1.A.)

The next day, the lawyer who oversaw the closing sent Warren a letter, stating, "Pursuant to your letter dated August 3, 2010 to Wade & Rebecca Kundinger, Donnie & Fredella Prather, and Appliance Distributors, Inc., enclosed please find the following: . . . Individual Limited Guaranty (Donnie & Fredella Prather) (original)." (Dkt. 71, Ex. 1.B.) TCFIF confirmed receipt of the signed guaranty in a letter to the Kundingers and the Prathers on September 1, 2010, discussing which financing requirements were still outstanding. The letter states, "Within 3 Weeks of Closing – Execution of new personal guaranty by Donnie and Fredella Prather, limited to $500,000 and 18 months (limitations are post closing). – Received 8/10/2010, this condition has been fulfilled." (Dkt. 71, Ex. 2.A (emphasis in original).)

Over the course of the fall of 2010, the relationship between the Prathers and Kundingers deteriorated as inconsistencies in ADI's financial records came to light and the Kundingers alleged the Prathers had made misrepresentations regarding ADI during the sale.[5] Rebecca

---

[5] The Prathers argue that the confusion stemmed from a mistake that ADI's bookkeeper had made in double-booking a vendor account receivable. After the Prathers learned of this mistake, they agreed to pay this amount to ADI. (Dkt. 67, Ex. 1, Affidavit of Fredella Prather ("Fredella Prather aff.") ¶ 15.) But because of the bad feelings between the Prathers and Kundingers, the Prathers instead decided (and the Kundingers agreed) to pay the amount to TCFIF directly to reduce the floor plan line. (*Id.*) Fredella Prather states in her affidavit that she spoke with Warren on December 28, 2010 and "explained that with the Kundingers excluding Donnie and me from our involvement at ADI, our Guaranty ended. Mary Alice Warren indicated her agreement on that call." (*Id.*) Warren states in her supplemental affidavit that at no point after she sent the Prathers a letter on September 1, 2010 did she "receive a call in which the Prathers contending they were terminating the Guaranty." (Dkt. 71, Ex. 2, Supplemental Affidavit of Mary Alice Warren ("Warren supp. aff.") ¶ 5) At the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence. *See Omnicare*, 629 F.3d at 704. The court does note, however, that the guaranty provides, "No modification, waiver or amendment of any

Kundinger emailed Warren on November 2, 2010 that she was meeting with Fredella Prather the next day to review audit sheets. (Dkt. 67, Ex. 8.) Warren responded that she was "so glad to hear that Fredella Prather is back to help figure this out—I was distressed to hear that she & Donnie had gone since their staying on-site for six months had been an important consideration of the credit approval." (*Id.*)

ADI did not fare well under the Kundingers' leadership, and TCFIF declared ADI to be in default under the security agreement on July 13, 2011 by way of a letter it sent to Wade Kundinger, copying the Prathers. (Dkt. 67, Ex. 9.) The letter required ADI to fulfill certain conditions to retain its line of credit, including providing TCFIF with "An Amendment to the Individual Guaranty from Donnie and Fredella Prather extending the termination date from 2/5/2012 to 8/5/2013, within 60 days of the date of this letter."[6] (*Id.* at 1.) But ADI continued to have problems paying TCFIF and ultimately breached its obligations under the security agreement by failing to make a full and timely payment of the amounts due. Accordingly, TCFIF sent written notice of default to ADI and the Prathers on November 7, 2011, and again on November 16, 2011. (Dkt. 54, Exs. 1.C, 1.D.) The second notice informed them of past due payments of $179,205.74 and demanded payment of this amount by November 25, 2011. The letter noted that by copying the guarantors, they were "hereby notified of the matters herein and any demand made upon [ADI] is also made upon each guarantor." (*Id.* at Ex. 1.D.) But this payment was not made, prompting TCFIF to exercise its contractual right under the security agreement to accelerate all amounts due and owing by ADI. On December 22, 2011, TCFIF sent

---

of the provisions of this Guaranty shall be binding upon TCFIF except as expressly set forth in a writing duly signed by an authorized officer or agent of TCFIF and delivered by TCFIF to the Guarantor." (Guaranty at 2.) The effect of this alleged conversation, if any, is discussed below.

[6] The record does not reveal that the Prathers ever executed such amendment.

a notice to Wade Kundinger, copying the Prathers, demanding payment of the whole amount due under the financing agreement, $558,304.15. (Dkt. 54, Ex. 1.E.) The Prathers and ADI failed to make this payment.

During this period, TCFIF took steps to monitor and protect its security interest while ADI worked to repay TCFIF.[7] But despite sending an employee to ADI's premises to monitor activities,[8] TCFIF discovered that some of ADI's inventory remained unaccounted for when ADI shut down on December 30, 2011. In fact, when ADI closed, the inventory shortfall had increased to $301,869 from $180,669.73 on December 16. (*See* dkt. 68, Ex. 9 at 1-2.) In January 2012 TCFIF began repossessing inventory from ADI, which it sold through private sale to Pieratt's, another local appliance distributor, or returned to manufacturers. It applied the amounts received from the liquidation of the inventory to the outstanding amount owed by ADI and the Prathers. TCFIF did not notify the Prathers ten days before it disposed of the inventory, even though the guaranty provided, "Any notice of disposition shall be deemed reasonably and

---

[7] The Prathers allege that even though TCFIF sent a representative to monitor the Kundingers' activities at the end of 2011, TCFIF, "to punish Defendants and benefit the Kundingers, allowed the Kundingers to take the inventory as well as funds generated from the sale of the inventory for the Kundingers' benefit instead of paying down the floor plan loan." (Dkt. 66 ¶ 34.) They provide some evidence that the Kundingers absconded with inventory, although a TCFIF employee specifically testified that he was not aware of the Kundingers taking inventory and not paying for it. (Dkt. 68, Ex. 1, Deposition of Matthew Rice ("Rice dep.") at 280:15-20.) This issue will be discussed further below, but the court does note that the Prathers waived the right to argue that TCFIF cannot collect from them for failure to enforce the loan agreement against ADI. (*See* guaranty at 1.)

[8] The Prathers insinuate irregularity concerning the employee TCFIF sent to ADI's premises, Sam Edwards, noting that Edwards himself purchased a washing machine and clothes dryer from ADI on December 28, 2011. (*See* dkt. 68, Ex. 15.) Edwards testified in his deposition, however, that he purchased it "at cost plus five percent," which was "whatever everybody else was paying." (Dkt. 68, Ex. 6, Deposition of Sam Edwards ("Edwards dep.") at 43:11-18.) A comparison of ADI's inventory list (dkt. 68, Ex. 10 at 4) and Edward's ADI invoice for the washer and dryer (dkt. 68, Ex. 15) reveals that Edwards paid roughly cost for the appliances ($378 for each) and not cost plus five percent. The Prathers insist that this is less than the average consumer and include an invoice for a different ADI customer who purchased the same washer and dryer on December 22, 2011 for $420 each (although the Prathers did not specifically point the court to this invoice and instead left the court to sort through their exhibits and compare item numbers). (Dkt. 69, Ex. 1 at 33.)

properly given if given to the Guarantor at least 10 days before such disposition in accordance with the notice provision below." (Guaranty at 2.)

TCFIF now seeks $264,260.22 for inventory it was unable to repossess[9] and $5,628.40 for the deficiency balance for repossessed inventory resold to manufacturers pursuant to repurchase agreements.[10] It also seeks interest, costs, and attorneys' fees, to which it is entitled under the security agreement.[11]

## ANALYSIS

## I. Whether the Guaranty Is Enforceable

The parties agree that TCFIF's breach of guaranty claim against the Prathers is governed by Illinois law, under which "[a] guaranty is a 'third party's promise to answer for payment on or fulfill an obligation if the person primarily liable fails to perform.'" *Dynegy Mktg. & Trade* v. *Multiut Corp.*, 648 F.3d 506, 519 (7th Cir. 2011) (quoting *Panno* v. *Nicolau*, 529 N.E.2d 95, 98, 174 Ill. App. 3d 890, 124 Ill. Dec. 378 (1988)).

The parties do not agree, however, on whether the court should judge this suit as one for breach of contract or breach of guaranty. (*See, e.g.,* dkts. 60 at 10; 62 at 7.) A plaintiff claiming breach of contract under Illinois law must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4)

---

[9] The Prathers assert that this total represents inventory that TCFIF allowed the Kundingers to "give away" to clients, as much of the inventory that was not repossessed had been at ADI clients' "model homes." (Dkt. 65 ¶ 30.)

[10] In its reply and opposition briefs, TCFIF agreed to forego payment of $29,248.70, representing the deficiency balance for repossessed inventory resold to Pieratt's. (Dkts. 62 at 8-9; 70 at 9.)

[11] As noted above, TCFIF originally brought this suit against other entities including the Kundingers and ADI (dkt. 1) but voluntarily dismissed suit against the Kundingers (dkt. 14). The court entered default judgment against the other defendants. (Dkt. 30.) This does not affect any claim that TCFIF has against the Prathers because the guaranty provides that the Prathers' liability is "unconditional, irrevocable and unaffected by . . . the acceptance of additional parties primarily or secondarily liable on the Liabilities." (Guaranty at 1.)

resultant damages. *See, e.g., Geimer* v. *Bank of Am., N.A.*, 784 F. Supp. 2d 926, 935 (N.D. Ill.

2011) (quoting *Reger Dev., LLC* v. *Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)). To

show a breach of guaranty under Illinois law, the plaintiff must show proof of (1) the original

indebtedness; (2) the debtor's default; and (3) the guaranty. *See, e.g., Bank of Montreal* v. *SK

Foods, LLC*, No. 09 C 3479, 2010 WL 3385534, at *3 (N.D. Ill. Aug. 19, 2010) (quoting *Mid-

City Indus. Supply Co.* v. *Horwitz*, 476 N.E.2d 1271, 1277, 132 Ill. App. 3d 476, 87 Ill. Dec. 279

(1985)). "While breach of guaranty and breach of contract claims have different elements, they

are closely aligned, with a guaranty enforced according to general contract principles." *Gen.

Elec. Bus. Fin. Servs. Inc.* v. *Hedenberg*, No. 10 C 5094, 2011 WL 1337105, at *2 (N.D. Ill. Apr.

7, 2011) (citing *F.D.I.C.* v. *Rayman*, 117 F.3d 994, 998 (7th Cir. 1997)). Where a breach of

guaranty is "crafted . . . as a breach of contract," the court construes the claim according to

breach of contract principles. *Id.*

TCFIF argues that its case is a breach of guaranty and should be considered as such. Its

complaint against the Prathers, however, is styled as a "breach of contract" claim. (*See* dkt. 1 at

14-16.) The court thus considers whether TCFIF makes out a claim for breach of contract.

## A.     Whether There Is a Valid and Enforceable Guaranty

### 1.     Ambiguity of Terms[12]

The Prathers argue that two conflicting provisions regarding the term of the guaranty

render it unenforceable. The meaning of a guaranty agreement is a matter of law to be

determined by the court. *See Cohen* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 618

---

[12] The Prathers argue in a footnote in their reply brief in support of their summary judgment motion that the alleged inconsistency the guaranty regarding its duration—18 months and ten years— could be due to mutual mistake. (See dkt. 72 at 6 n.1.) The court will not consider the applicability of the doctrine of mutual mistake because this argument is only articulated in the reply brief. *See, e.g., Mitsui Sumitomo Ins. Co., Ltd.* v. *Moore Transp., Inc.*, 500 F. Supp. 2d 942, 953 n.15 (N.D. Ill. 2007) (citing *United States* v. *Adamson*, 441 F.3d 513, 521 (7th Cir. 2006); *United States* v. *Duran*, 407 F.3d 828, 844 n.7 (7th Cir. 2005)).

N.E.2d 1060, 1063, 248 Ill. App. 3d 188, 188 Ill. Dec. 490 (1993) (citing *Exch. Nat'l Bank of Chicago* v. *Bergman*, 505 N.E.2d 1236, 1237, 153 Ill. App. 3d 470, 106 Ill. Dec. 445 (1987)).  If the language of the guaranty is unambiguous, "it must be enforced as written."  *TH Davidson & Co.* v. *Eidola Concrete, LLC*, 972 N.E.2d 823, 825, 2012 IL App (3d) 110641, 362 Ill. Dec. 108 (2012) (citing *McLean Cnty. Bank* v. *Brokaw*, 519 N.E.2d 453, 456, 119 Ill. 2d 405, 116 Ill. Dec. 561 (1988)).  The language of a guaranty "is ambiguous only if it is susceptible to having more than one meaning.'"  *Chromalloy Am. Corp.* v. *Fields*, Nos. 90 C 6459, 90 C 6460, 1992 WL 38975, at *2 (N.D. Ill. Feb. 26, 1992) (quoting *Flora Bank & Trust Co.* v. *Czyzewski*, 583 N.E.2d 720, 725, 222 Ill. App. 3d 382, 164 Ill. Dec. 804 (1991)).  If there is "doubt that arises from the contract language," then the guaranty "is to be strictly construed in favor of the guarantor."  *Household Fin. Servs., Inc.* v. *Mortg. Grp.*, No. 01 C 5567, 2004 WL 2457781, at *12 (N.D. Ill. Oct. 29, 2004) (citing *T.C.T. Bldg. P'ship* v. *Tandy Corp.*, 751 N.E.2d 135, 139-40, 323 Ill. App. 3d 114, 256 Ill. Dec. 82 (2001)).

A guaranty is not ambiguous, however, merely because the parties interpret it differently. *Chromalloy*, 1992 WL 38975, at *2.  Additionally, like other contracts, the terms of a guaranty should not be read so as to render certain provisions superfluous.  *See, e.g., Bank of Am. Nat'l Trust & Savs. Ass'n* v. *Schulson*, 714 N.E.2d 20, 28, 305 Ill. App. 3d 941, 239 Ill. Dec. 462 (1999) (adopting interpretation of guaranties that "gives effect to all the contract terms"); *see also In re Marriage of Arvin*, 540 N.E.2d 919, 922, 184 Ill. App. 3d 644, 133 Ill. Dec. 53 (1989) ("An interpretation of an agreement which would render some provisions superfluous should be avoided.").

The guaranty that the Prathers signed on August 5, 2010 specifies both a time period that liabilities would accrue under the guaranty and a term.  In the first paragraph, it provides that the

Prathers' guaranty "shall not extend to any Liabilities created after February 5, 2012," *i.e.*, 18 months after it is signed. (Guaranty at 1.) The last paragraph states that the guaranty "shall continue in effect for a period of ten (10) years." (*Id.* at 3.) The court is persuaded by TCFIF's argument that these two provisions are not inconsistent.[13] The logical reading of the guaranty is that the Prathers' liability only extended to obligations incurred through February 5, 2012, and that TCFIF could enforce the guaranty for ten years.[14]

The Prathers attempt to refute this reading by stating that it "conflicts with Plaintiff's assertion regarding its intent of the duration of the Guaranty," and cite to extrinsic evidence, arguing that the court can take into account evidence outside the contract itself to interpret the guaranty. (Dkt. 72 at 7.) But "[u]nder the parol evidence rule, evidence of a prior or contemporaneous agreement may not be admitted to vary the terms of a complete, certain, and unambiguous instrument." *Basu* v. *Stelle*, 603 N.E.2d 1253, 1256, 237 Ill. App. 3d 113, 177 Ill. Dec. 879 (1992). Because the court finds that the guaranty was not ambiguous, the parol evidence rule bars the court from considering extrinsic evidence. *See, e.g., 84 Lumber Co.* v. *Denni Constr. Co.*, 571 N.E.2d 231, 233, 212 Ill. App. 3d 441, 156 Ill. Dec. 644 (1991) (reversing trial court for allowing defendants to testify "that it was not their intent to personally

---

[13] In any event, and as discussed throughout this opinion, there is no evidence that the term of the guaranty could be any less than 18 months and all events relevant to this suit occurred within the 18 month period. ADI defaulted on its obligations under the security agreement first in July 2011 and then again in November 2011 before shutting down in December 2011, and the Prathers had notice of the default throughout this period. TCFIF liquidated ADI's remaining inventory in January 2012. TCFIF filed its suit against ADI, the Prathers, and the other guarantors of the security agreement on January 17, 2012. All of these events occurred prior to February 5, 2012.

[14] Further support for this reading is found in Illinois' statute of limitations on breach of written contract actions, which is ten years. *See* 735 Ill. Comp. Stat. 5/13-206. Courts have applied this ten-year statute of limitations to guaranties. *See, e.g., Granville Nat'l Bank* v. *Alleman*, 605 N.E.2d 124, 128, 237 Ill. App. 3d 890, 178 Ill. Dec. 685 (1992) (explaining why normal ten-year statute of limitations applicable to claims for breach of guaranty did not apply to continuing guaranty); *Cessna Fin. Corp.* v. *Brown*, No. 88 C 3369, 1995 WL 462190, at *2 (N.D. Ill. Aug. 3, 1995) (applying ten-year statute of limitations to guaranty).

guarantee the credit" where the underlying contract was unambiguous); *Benedict* v. *Fed. Kemper Life Assurance Co.*, 759 N.E.2d 23, 27-28, 325 Ill. App. 3d 820, 259 Ill. Dec. 543 (2001) (because insurance policy was unambiguous, "any enforcement of the alleged promises made at the point of sale would violate the parol evidence rule and must be disregarded").[15]

Further, the "integration" or "merger" clause in the guaranty defeats this argument. "A merger clause . . . negates the impact of earlier negotiations and contract drafts, and states that the written contract is the complete expression of the parties' agreement." *Rosenblum* v. *Travelbyus.com Ltd.*, 299 F.3d 657, 665 (7th Cir. 2002); *see also W.W. Vincent and Co.* v. *First Colony Life Ins. Co.*, 814 N.E.2d 960, 966, 351 Ill. App. 3d 752, 286 Ill. Dec. 734 (2004). "[A] court will not consider parol evidence of prior negotiations to create an 'extrinsic ambiguity' where the parties to a contract have included an integration clause." *W.W. Vincent*, 814 N.E.2d at 966 (citation omitted). The effect of a merger clause is to "permit[ ] either party to invoke the parol evidence rule to exclude evidence of additional contractual terms not included in the written agreement." *Rosenblum*, 299 F.3d at 665. The merger clause here provides that the guaranty "contains all of the understandings, promises and undertaking of the parties hereto concerning the subject matter. All prior undertakings and agreements, oral or written, concerning the subject matter are merged herein." (Guaranty 1 at 2.) In the face of this clear agreement by the parties, the court may not look outside the bounds of the guaranty itself.

---

[15] The court also does not give weight, as the Prathers ask it to do, to Warren's deposition testimony regarding any alleged inconsistency in the guaranty. Warren testified that the ten-year period in the last paragraph of the guaranty was "a standard provision that was in this form." (Dkt. 67, Ex. 6, Mary Alice Warren Deposition ("Warren dep.") at 34:24-25.) In response to the question, "So the guaranty that TCFIF had the Prathers sign is inconsistent regarding the term of the guaranty that had been negotiated in its entirety? I understand you're staying there's one point that identifies the term, but another point that doesn't, so it's inconsistent with that term, correct?" Warren responded, "Correct." (*Id.* at 35:18-24.) As noted above, however, interpretation of the contract is a question of law for the court, and "[l]ay witnesses are not required, or even permitted, to testify about questions of law." *Thomas* v. *Ragland*, 324 F. Supp. 2d 950, 966 (W.D. Wisc. 2004) (citing *United States* v. *Espino*, 32 F.3d 253, 257 (7th Cir. 1994)); *see also People* v. *Williams*, 910 N.E.2d 1272, 1279 n.3, 393 Ill. App. 3d 77, 331 Ill. Dec. 516 (2009), *aff'd* 940 N.E.2d 50, 239 Ill. 2d 119, 346 Ill. Dec. 50.

The cases on which the Prathers rely do not convince the court otherwise. For example, the Prathers rely on *Fruehauf Corporation* v. *Auletta*, No. 86 C 10178, 1987 WL 20423, at *2 (N.D. Ill. Nov. 20, 1987), in which the court applied the rule that guaranties should be strictly construed against the drafter and denied the drafter summary judgment on its claim under a guaranty for an investment credit lease. There, the parties had entered into a number of lease agreements, and the court could not determine on summary judgment that the lease on which the debtor defaulted was the one the guarantor had agreed to guarantee. *Id.* at **1-2. Here, the Prathers agreed to guaranty the liabilities of one entity under one security agreement up until a certain date, eliminating the ambiguity present in *Fruehauf*. In *Emrick* v. *First National Bank of Jonesboro*, 756 N.E.2d 914, 918, 324 Ill. App. 3d 1109, 258 Ill. Dec. 640 (2001), the court reversed a summary judgment ruling that extended the guarantor's liability to a $30,000 loan she had not actually guaranteed. Here, the Prathers admittedly *did* sign the guaranty making them liable for ADI's debts incurred up until February 5, 2012. And in *Bruner* v. *Wolford's Estate*, 191 N.E. 70, 72, 356 Ill. 514 (1934), the court held that an instrument whose language did "not constitute a guaranty" could not be enforced against the alleged guarantor who had not even signed the instrument himself. Here, though the Prathers protest that they signed a "draft" version of the guaranty inadvertently, there is no dispute that they executed the guaranty and there is no indication they informed TCFIF of this alleged mistake until this suit. The inclusion of the two time periods in the guaranty does not render the guaranty unenforceable.

### 2. Whether the Guaranty Was In Force When ADI Defaulted

Persisting in their argument that the court should consider evidence outside the four corners of the guaranty, the Prathers argue that the guaranty was not in force at the time ADI defaulted on its obligations. They come to this argument by contending that (1) the guaranty is

ambiguous, (2) so the court can consider evidence outside the guaranty, (3) and by doing so the court will understand that the parties' intent was to limit the guaranty to time the Prathers remained at ADI to help the Kundingers, which was supposed to be 18 months, (4) but the Kundingers kicked the Prathers out in December 2010, (5) and because the court has to construe the guaranty in favor of the guarantors, (6) the court should construe it to find that the guaranty was terminated as soon as the Kundingers excluded the Prathers from ADI, *i.e.*, December 2010. They also argue that Fredella Prather terminated the guaranty verbally by calling Warren after the Kundingers excluded the Prathers from ADI, and that Warren verbally accepted this termination.

But the Prathers' argument suffers from the very first step. The court has already found that the guaranty was not ambiguous. Moreover, even accepting Fredella Prather's statement that she terminated the guaranty orally and that Warren accepted this termination, the court still could not find that the guaranty was actually terminated. The guaranty clearly provides, "No modification, waiver or amendment of any of the provisions of this Guaranty shall be binding upon TCFIF except as expressly set forth in a writing duly signed by an authorized officer or agent of TCFIF and delivered by TCFIF to the Guarantor." (Guaranty at 2.) Fredella Prather's alleged conversation with Warren was ineffective to terminate the guaranty. *See, e.g., Miller* v. *Dupli-Color Prods. Co.*, No. 87 C 6247, 1989 WL 118578, at *2 (N.D. Ill. Sept. 22, 1989) (under Illinois law, "termination provisions must be strictly met").[16]

While it is true that "liability cannot be . . . extended beyond the precise terms of the guaranty," liability "cannot be varied . . . beyond the precise terms of the guaranty." *Emrick*, 756 N.E.2d at 918. To find that the Prathers' liability should be limited to December 2010 when the

---

[16] It is also inconsistent for the Prathers to argue that they did not execute the guaranty while simultaneously arguing that the terminated the guaranty orally.

Kundingers excluded the Prathers from ADI would vary the liability to which the parties agreed. The guaranty was in force when ADI defaulted.

### B.     Whether There Was Consideration

As with contract, there must be consideration to support a guaranty. *See First Nat'l Bank of Red Bud* v. *Chapman*, 366 N.E.2d 937, 939, 51 Ill. App. 3d 738, 9 Ill. Dec. 426 (1977). "In Illinois, it is well-established that there is adequate consideration for a guaranty, where the guaranty is executed contemporaneously with the creation of the principal loan." *Laborers' Pension Fund* v. *Dynamic Wrecking & Excavation, Inc.*, No. 07 C 2156, 2008 WL 4874110, at *8 (N.D. Ill. June 13, 2008). For example, in *Dynamic Wrecking*, a case on which the Prathers rely, the court held that there was adequate consideration for a guaranty where it was signed "as a condition to receiving the terms of the underlying note" and executed "contemporaneously" with the underlying note. *Id.* at *8. Conversely, "where a debt is incurred and thereafter a third party promises to pay or guarantee it, some additional consideration is necessary to support such promise." *First Nat'l*, 366 N.E.2d at 940.

The Prathers argue that the guaranty cannot be enforced against them because no consideration underlies the guaranty. The sale of ADI from the Prathers to the Kundingers closed on August 5, 2010. The Prathers also signed the guaranty on that date. But they insist that the guaranty they signed was a mere "draft guaranty" and not a final version of the guaranty, so the sale of ADI constituted inadequate consideration.[17]  (Dkt. 60 at 70.)  They point to

---

[17] In this regard, the Prathers have moved to strike TCFIF's response to paragraph 6 of the Prathers' additional facts (dkt. 71 ¶ 6) and paragraph 4 of Warren's affidavit. (Warren aff. ¶ 4.) Paragraph 6 of the Prathers' additional facts states, "The consideration received by Defendants for the guaranty was that 'they were able to consummate the sale transaction' of ADI to the Kundingers."  (Dkt. 71 ¶ 6.)   In response, TCFIF states that it "cannot speculate as to all consideration received by the Prathers for executing the Guaranty" but that "receipt of the executed Guaranty from the Prathers was a condition of TCFIF providing financing after the sale to the Kundingers" because "the Prathers could not have completed their sale of ADI to the Kundingers until the Kundingers secured financing for ADI."

correspondence from TCFIF indicating that the guaranty needed to be executed within three weeks of closing, and the email that Warren sent to Fredella Prather the day of closing saying that the final version of the guaranty was not ready yet. They explain, "Given that the only consideration for Defendants' Guaranty was to enable the sale of ADI to the Kundingers to proceed, and that sale proceeded before Plaintiff intended to obtain the Guaranty, before Plaintiff tendered a final version of the Guaranty and before Defendants executed the Guaranty, Plaintiff's [*sic*] cannot show sufficient consideration for the Guaranty." (*Id.*) They also argue that TCFIF contradicts itself by arguing that parol evidence should not be used to determine the guaranty's duration but that it should be used here to find that the ability to sell ADI to the Kundingers

---

(*Id.*) TCFIF supports this by citing to paragraph 4 of Warren's affidavit, which states, "I understood that for the Kundingers to be able to purchase and operate ADI, the Kundingers needed to secure financing for ADI." (Warren aff. ¶ 4.)

While they do not say this directly, it appears that the Prathers wish to strike these paragraphs because of their argument that they did not actually execute the guaranty on August 5, 2010. If they did not execute the guaranty on that date, they argue, then there would need to be additional consideration outside of the sale of ADI to support the guaranty. But because the court finds that the Prathers *did* execute the guaranty on August 5, 2010, and because there was adequate consideration for the guaranty, this argument is moot.

Moreover, the court will not strike paragraph 4 of Warren's affidavit. The Prathers argue first that Warren's "understanding" must be stricken for lack of evidentiary basis. (*Id.* ¶ 4.) But as discussed in footnote 4, *supra*, Warren states in the first paragraph of her affidavit that all facts in the affidavit are "based upon [her] personal knowledge and the corporate business records pertaining to this matter that are maintained in the ordinary course of TCFIF's business." (Warren aff. ¶ 1.) She thus states a reliable basis for this understanding. *Romanowski* v. *Lucent Techs., Inc.*, No. 01 C 8360, 2002 WL 31641609, at *7 n.3 (N.D. Ill. Nov. 22, 2002). Nor does her affidavit "attempt to reject" her deposition testimony, as it is not inconsistent with her deposition statement that "what the Prathers got for the guaranty, for signing the guaranty [was] just that the transaction with the Kundingers could go forward[.]" (Warren dep. at 37:8-12.) Paragraph 22 of TCFIF's statement of additional facts (dkt. 63 ¶ 22), which is based on paragraph 4 of Warren's affidavit, also will not be stricken.

The Prathers also argue that TCFIF's response to paragraph 6 of the Prathers' statement of additional facts should be stricken because it "fails to admit or deny the asserted fact." (Dkt. 74 ¶ 3.) The court agrees that TCFIF's statement is "non-responsive" and the Prathers' statement in paragraph 6 is thus deemed admitted. *Ricks* v. *U.S. Alliance Fire Prot., Inc.*, No. 11 C 1237, 2013 WL 1397707, at *6 n.2 (N.D. Ill. Apr. 5, 2013); *see also Nawrocki* v. *Scully*, No. 05 C 1466, 2006 WL 1735294, at *2 n.7 (N.D. Ill. June 19, 2006). Additionally, TCFIF's response to paragraph 6 seems to contradict Warren's statement during her deposition that it was correct to say the consideration the Prathers received for the guaranty was "*just* that the transaction with the Kundingers could go forward[.]" (Warren dep. at 37:8-12 (emphasis added).)

constituted adequate consideration for the guaranty. (*See* dkt. 70 at 3 ("As evidenced by the financing approval letters sent by TCFIF[ ], the Prathers' Guaranty was always required for TCFIF[ ] to provide financing" to ADI under its new ownership.").)

Even where an agreement is otherwise unambiguous on its face, a party may introduce parol evidence to prove lack of consideration. *See O'Brien* v. *Cacciatore*, 591 N.E.2d 1384, 1390, 227 Ill. App. 3d 836, 169 Ill. Dec. 506 (1992) ("An exception to the parol evidence rule provides that extrinsic evidence may be introduced to prove . . . a lack of consideration."); *see also In re James*, Bankr. No. 08 B 17044, 2010 WL 771765, at *8 (Bankr. N.D. Ill. Mar. 3, 2010) ("Parol evidence of the parties' intentions is admissible where a party alleges lack of consideration or fraud."); *cf. Johnson* v. *Sisk Cos.*, No. 1-10-3847, 2011 Ill App (1st) 103847-U (2011) (unpublished) ("As there is no allegation of mutual mistake, conditional delivery, a lack of consideration or fraud[,] parol evidence is not admissible to construe the parties['] agreement in the case at bar.") (citations omitted). It is thus proper for the court to consider parol evidence on the consideration issue, as both parties urge the court to do.

TCFIF made clear to the Prathers before sale of ADI that they needed to execute a personal guaranty for TCFIF to continue ADI's floor plan financing. (*See* dkt. 71, Ex. 1.A.) Despite TCFIF's provision of extra time for the Prathers to do so, and despite Warren's email on August 5, 2010 that the personal guaranty was not ready to be signed yet, it is undisputed that the Prathers did execute the guaranty on August 5, 2010. By executing the guaranty, Fredella Prather and Donnie each "acknowledge[d] that (s)he has had ample opportunity to review and consider the terms and conditions of this Guaranty and fully understand[ ] the terms and conditions hereof." (Guaranty at 3.)

For all of the Prathers' insistence about executing a "draft" guaranty, they do not contest that they actually did sign the guaranty on August 5, 2010, or that they also completed the sale of ADI to the Kundingers on that date. They do not argue that they signed a later version of the guaranty for which there would need to be additional consideration, or that they later informed TCFIF that they had mistakenly signed a "draft" guaranty, even though they received confirmation from TCFIF of their execution of the guaranty (dkt. 71, Ex. 2.A) and later received correspondence about it. (*See, e.g.*, dkt. 67, Ex. 9.) There is no way around the fact that they signed the guaranty "contemporaneously" to benefit from it by closing the sale of ADI to the Kundingers. Moreover, the guaranty itself states that it is being made "[f]or value received and in consideration of any loan or other financial accommodation of any kind heretofore, now or hereafter made or given by [TCFIF] to [ADI] or a customer of [ADI]." (Guaranty at 1.) This loan to which the guaranty refers is the continued floor plan financing to ADI as set out in the security agreement. The parties thus agreed TCFIF would continue financing ADI if the Prathers' signed the guaranty, constituting sufficient consideration.[18]

## II.     Defenses to the Guaranty

### A.          Whether TCFIF Breached the Guaranty

The Prathers argue that even if the guaranty is valid and enforceable, TCFIF cannot prevail because it failed to substantially perform under the guaranty by failing to notify the Prathers of its disposition of ADI's inventory with at least ten day's warning.[19]

---

[18] Because the Prathers did close the sale of ADI and sign the guaranty contemporaneously, the court need not delve into the parties' arguments regarding the meaning of "contemporaneously." (*See* dkts. 62 at 4-5; 70 at 4; 72 at 3-4.)

[19] TCFIF argues any alleged failure to perform is irrelevant because unlike in a breach of contract suit, a plaintiff in a breach of guaranty actions need not show substantial performance on its part, but only proof of the original indebtedness, the debtor's default, and the guaranty. *See, e.g., Bank of Montreal*, 2010 WL 3385534, at *3; *Geimer*, 784 F. Supp. 2d at 935. The court disagrees. As explained above,

The sole language in the guaranty about the disposition of collateral states, "Any notice of a disposition shall be deemed reasonably and properly given if given to the Guarantor at least 10 days before such disposition in accordance with the notice provision below." (Guaranty at 2.) TCFIF insists that this language does not impose an affirmative obligation to notify the Prathers before it disposed of inventory. The Prathers respond that it did impose an affirmative obligation and TCF's failure to notify was a material breach, because of which TCFIF cannot prevail in its action. They further argue that the absence of an actual notice requirement here renders the guaranty ambiguous, so it should be read in the light most favorable to them and thus to require notice by TCFIF.

The meaning of the language of the guaranty becomes clear when read in light of the law governing disposition of ADI's inventory by its secured creditor. Although neither party invokes it, Illinois' Uniform Commercial Code ("the UCC") applies to the disposition of ADI's inventory.[20] 810 Ill. Comp. Stat. 5/1-101 *et seq.* The UCC provides that a secured party that disposes of collateral "shall send" the guarantor "a reasonable authenticated notice of disposition." 810 Ill. Comp. Stat. 5/9-611(b), (c); *see also First Galesburg Nat'l Bank & Trust Co.* v. *Joannides*, 469 N.E.2d 180, 183, 103 Ill. 2d 294, 82 Ill. Dec. 646 (1984) (a guarantor is entitled to notice of proposed disposition under the UCC) (collecting cases). But the secured creditor is not barred from bringing a deficiency action against the debtor or guarantor merely

because TCFIF's complaint styles its action against the Prathers as "breach of contract," the court considers its case in light of those principles. *Hedenberg*, 2011 WL 1337105, at *2. TCFIF's performance is thus at issue.

[20] Pursuant to the security agreement ADI executed with TCFIF, TCFIF became a secured creditor and was accordingly granted a security interest in all of ADI's collateral as security for the indebtedness. (*See* dkt. 54, Ex. 1.A at 1.) This triggered TCFIF's obligations under the UCC. *See, e.g., Ryder* v. *Bank of Hickory Hills*, 612 N.E.2d 19, 22, 242 Ill. App. 3d 1042, 183 Ill. Dec. 762 (1993) ("Article 9 of the U.C.C. applies to any transaction which is intended to create a security interest in personal property, including goods, documents, instruments, intangibles, chattel paper or accounts.").

because notice was not given prior to disposition. *Id.*; *see also Gen. Motors Acceptance Corp.* v. *Stoval*, 872 N.E.2d 91, 101, 374 Ill. App. 3d 1064, 313 Ill. Dec. 331 (2007) ("[O]ur supreme court has held that none of the UCC's provisions provide that a lack of notice bars a deficiency judgment."). Instead, "[i]n Illinois, if the secured party fails to give the debtor reasonable notification of the sale of collateral, there arises a rebuttable presumption that the value of the collateral sold was equal to the indebtedness." *Ford Motor Credit Co.* v. *Solway*, 825 F.2d 1213, 1217 (7th Cir. 1987); *see also First Galesburg*, 469 N.E.2d at 183.

The guaranty provision deems ten days' notice to be "reasonable" notice for purposes of this inquiry under the UCC. But under Illinois law, the secured party can rebut the presumption that the value of the collateral equaled that of the debt by showing that the value of the collateral was less than the amount of indebtedness and that the sale was commercially reasonable. *Ford*, 825 F.2d at 1217. The terms of the guaranty thus do not impose an affirmative requirement on TCFIF, but provide a guideline for the reasonableness of notice required by the UCC. Because no affirmative obligation was imposed on TCFIF, its failure to notify is not a breach of contract that excuses the Prathers' performance.

Further, TCFIF successfully rebuts the presumption that the collateral value was equal to the indebtedness. TCFIF repossessed inventory that had been financed for $281,609.40. (Dkt. 54 ¶ 24.) This included inventory from the manufacturer Electrolux financed by TCFIF for $265,958. TCFIF returned much of the Electrolux inventory to the manufacturer and received $212,161 in return, plus $2,719 for previously returned inventory. (*Id.* at ¶ 25.) It sold the remaining Electrolux inventory, financed for $53,797, to a local dealer called Pieratt's for $24,548.30. (*Id.* at ¶ 26.) TCFIF also repossessed General Electric inventory financed for $15,561.40, which TCFIF returned to the manufacturer in exchange for $9,933. (*Id.* at ¶ 27.)

TCFIF has agreed to drop its claim for the difference between the value of the merchandise it sold to Pieratt's and the price it received "[t]o avoid any arguments that this sale to Pieratt's was not commercially reasonable." (Dkt. 70 at 8-9.)

TCFIF thus attempts to collect just the amount it lost on the GE appliances, or $5,628.40. In addition, it attempts to collect on inventory that they were unable to repossess. TCFIF has successfully rebutted the presumption that the value of the collateral sold equaled that of the debt. First, it demonstrates that it was able to resell much of the collateral that they were able to repossess back to manufacturers pursuant to repurchase agreements. (Dkt. 63 ¶¶ 34, 35, 37.) Moreover, in the guaranty itself the Prathers agreed "that repurchase of inventory by a seller of goods pursuant to a repurchase agreement between TCFIF and such seller shall be a commercially reasonable method of disposition." (Guaranty at 1.)

Second, TCFIF attempts to collect an amount representing about two percent of the value of the appliances it was able to repossess. The court finds that it was commercially reasonable for TCFIF to enter into these transactions pursuant to the repurchase agreements. *See, e.g., Ryder* v. *Bank of Hickory Hills*, 612 N.E.2d 19, 23, 242 Ill. App. 3d 1042, 183 Ill. Dec. 762 (1993) ("Illinois courts have found commercially reasonable prices where the U.C.C. sale realized 62% of the collateral's fair market value . . . , where the sale realized 50% . . . , and where the beneficial interest had a fair market value of $550,000 but sold for only $3,500.") (citations omitted) (collecting cases). This is especially so in light of the fact that the Prathers do not argue that "the proceeds obtained from the noncomplying sale of the collateral is less than the proceeds that would have been obtained had the secured party complied with the notice requirement." *Firestone Fin. Corp.* v. *King Amusements, Inc.*, No. 12 C 04519, 2013 WL 1286665, at *5 (N.D. Ill. Mar. 28, 2013); *cf. Nat'l Acceptance Co. of Am.* v. *Medlin*, 538 F.

Supp. 585, 588 (N.D. Ill. 1982) ("The right to recover any loss stemming from the lack of notice necessarily includes any prejudice to the debtor from loss of his right of redemption under [810 Ill. Comp. Stat. 5/9-623] or from loss of the opportunity to take steps to drive up the sale price and eliminate or reduce any deficiency."). Additionally, the bulk of the amount TCFIF attempts to collect stems not from sale of collateral but from the deficiency representing the amount of collateral TCFIF was unable to repossess.

TCFIF has rebutted the presumption and demonstrated that the sale of collateral was commercially reasonable. Its recovery against the Prathers is not barred on this ground.

### B.      Whether TCFIF Acted in Bad Faith

Under Illinois law, "[a] covenant of good faith and fair dealing is implied in every contract, absent express language to the contrary, even when the guaranty waives all defenses." *Fifth Third Bank (Chicago)* v. *Stocks*, 720 F. Supp. 2d 1008, 1011-12 (N.D. Ill. 2010) (internal quotations and citations omitted). The Prathers argue that not only did TCFIF have a duty of good faith and fair dealing under the guaranty, but it breached that duty by allowing the Kundingers to steal or give away inventory. In particular, the Prathers allege that TCFIF allowed the Kundingers to "take inventory" from November 22 through December 15 totaling $139,426, and that after December 15, it "allowed the Kundingers to sell $121,200 of the inventory and to keep $169,601 of the sale proceeds without making any payment" to TCFIF. (Dkt. 64 at 14.) The Prathers also point to the fact that much of ADI's inventory was at its customers' "model homes," and allege that TCFIF allowed the Kundingers to transfer $200,000 of repurchase agreement model home inventory to ADI's customers, either for no charge or in exchange for credit to the Kundingers. Finally, they point to transfers to "the Kundingers, their family members, and their friend for no charge, and to Plaintiff's employee at cost." (*Id.*) They explain

that TCFIF acted in this seemingly self-defeating manner because TCFIF blamed the Prathers "for ADI failing and the Kundingers losing the business." (*Id.* at 15.)

Were these incendiary allegations supported by evidence, the Prathers would have a good claim for breach of the duty of good faith and fair dealing. But there is nothing in the record that indicates that TCFIF willingly allowed the Kundingers to steal or give away merchandise, or even that they suspected the Kundingers were doing so. In fact, the very evidence to which the Prathers point to support these allegations paints an entirely benign picture of TCFIF's conduct. (*See, e.g.,* Dkt. 68, Ex. 1, Deposition of Matthew Rice ("Rice dep.") at 240:18-241:8 (TCFIF did not repossess merchandise from ADI immediately because the Kundingers had already paid TCFIF $400,000 that they "could have easily walked away with"); *id.* at 273:17-218:3 (TCFIF's investigator unsuccessfully attempted to verify location of some inventory); dkt. 68, Ex. 9 at 2 (Rice entry in TCFIF log that he called Rebecca Kundinger on December 22, 2011 to "get an understanding of where the cash is going").)

Correspondence between TCFIF and the Kundingers paints a less than rosy picture of their relationship. (*See, e.g.*, dkt. 68, Ex. 12 at 1 (Rice email to Rebecca Kundinger on January 5, 2012 that she was "being pretty demanding given the circumstance of how we worked with you for 45 days instead of picking everything up in early November" when deficiency first discovered).) The evidence does indicate that the Kundingers may not have dealt fairly or in good faith. (*See, e.g.*, dkt. 69, Ex. 1 at 31-32 (invoices showing Kundingers and others purchased items from ADI for $0.00).) But the question is not whether the Kundingers acted badly or whether the Prathers have a claim against any of the other defendants. It is whether TCFIF knew about it and allowed it to continue to the Prathers' detriment. According to the evidence, it did not. The only actual evidence the Prathers have is that TCFIF's employee who

was assigned to monitor ADI purchased appliances for himself at cost. But ADI did not lose money on this transaction, and there is no evidence that TCFIF knew about, let alone condoned, this behavior. The Prathers' argument that TCFIF breached the guaranty by failing to deal fairly and in good faith fails.

## CONCLUSION

For all of the reasons stated above, TCFIF's motion for summary judgment is granted. TCFIF is awarded $269,888.62 plus interests, costs, and attorneys' fees, as allowed by the guaranty. The Prathers' motion for summary judgment is denied, and their motion to strike is granted in part and denied in part. This case is terminated.

Date:   February 28, 2014

_____
U.S. District Judge Joan H. Lefkow